Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT
for the

MIDDLE District of FLORIDA

OCALA Division

| | | |
|---|---|---|
| Stephen Henderson | ) | Case No. |
| _Plaintiff(s)_ | ) | 5:23-W-262 SPC PRL |
| (Write the full name of each plaintiff who is filing this complaint. | ) | _(to be filled in by the Clerk's Office)_ |
| If the names of all the plaintiffs cannot fit in the space above, | ) | |
| please write "see attached" in the space and attach an additional | ) | |
| page with the full list of names.) | ) | |
| -v- | ) | |
| | ) | |
| | ) | |
| Charles Lockett (See Attached) | ) | |
| _Defendant(s)_ | ) | |
| (Write the full name of each defendant who is being sued.  If the | ) | |
| names of all the defendants cannot fit in the space above, please | ) | |
| write "see attached" in the space and attach an additional page | ) | |
| with the full list of names.  Do not include addresses here.) | ) | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

Attached page with additional list of names
of Defendant (s):

1) Charles Lockett, Warden
2) B. C. Cheatham, Warden
3) Gary Venuto, Doctor
4) FNU Mezyk, H.S.A.
5) German Herrera Alzate, PA-C
6) FNU Grant, OFFICER
7) FNU Hunkerson, Title unknown
8) FNU Dinis, Doctor (Challenge Program Coor-
dinator)
9) FNU Hughes, OFFICER,

And John /Jane Does.

Page 1(a) of 11

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Stephen Henderson |
| All other names by which you have been known: | Stephen Anthony Henderson |
| ID Number | #34996-044 |
| Current Institution | Federal Correctional Complex |
| Address | Coleman USP 2, P.O. Box 1034 |
| | Coleman                FL.       33521 |
| | City         State         Zip Code |

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. Make sure that the defendant(s) listed below are identical to those contained in the above caption. For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Charles Lockett |
| Job or Title *(if known)* | Warden |
| Shield Number | unknown |
| Employer | Bureau of Prisons |
| Address | USP Coleman II, 846 NE 54th Terrace |
| | Coleman,              FL.       33521 |
| | City         State         Zip Code |

[✓] Individual capacity   [✓] Official capacity

Defendant No. 2

| | |
|---|---|
| Name | R.C. Cheatham |
| Job or Title *(if known)* | Warden |
| Shield Number | unknown |
| Employer | Bureau of Prisons |
| Address | USP Coleman II, 846 NE 54th Terrace |
| | Coleman                FL.       33521 |
| | City         State         Zip Code |

[✓] Individual capacity   [✓] Official capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3
    Name      Dr. Gary Venuto
    Job or Title *(if known)*      Doctor
    Shield Number      unknown
    Employer      Bureau of Prisons
    Address      USP Coleman II, 846 NE 54th Terrace
     Coleman, FL. 33521
         *City*      *State*      *Zip Code*
    [✓] Individual capacity    [✓] Official capacity

Defendant No. 4
    Name      FNU Mezyk
    Job or Title *(if known)*      H.S.A.
    Shield Number      unknown
    Employer      Bureau of Prisons
    Address      USP Coleman II 846 NE 54th Terrace
     Coleman FL. 33521
         *City*      *State*      *Zip Code*
    [✓] Individual capacity    [✓] Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

    [✓] Federal officials (a *Bivens* claim)

    [ ] State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

N/A

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Attachment of Additional Defendant (s):

Defendant No. 5
Name: German Herrera Alzate
Job or Title (if known): PA-C
Shield Number: unknown
Employer: Bureau of Prisons
Address: USP Coleman II, 846 NE 54th Terrace
         Coleman,    FL.    33521

☑ Individual capacity ☑ Official capacity

Defendant No. 6
Name: FNU Grant
Job or Title (if known): Officer
Shield Number - unknown
Employer: Bureau of Prisons
Address: USP Coleman II, 846 NE 54th Terrace
         Coleman,    FL.    33521

☑ Individual capacity ☑ Official capacity

Page 3(A) of 11

Attached Defendants :

Defendant No. 7
Name: FNU Hankerson
Job or Title (if known): unknown
Shield Number : unknown
Employer : Bureau of Prisons
Address : USP Coleman II, 846 NE 54th Terrace
          Coleman,    FL.              33521

☑ Individual capacity ☑ Official capacity

Defendant No. 8
Name: FNU Dinis
Job or Title (if known): Doctor/Challenge
Program Coordinator
Shield Number : unknown
Employer : Bureau of Prisons
Address : USP Coleman II, 846 NE 54th Terrace
          Coleman,    FL.              33521

☑ Individual capacity ☑ Official capacity

page 3(B) of 11

Attached Defendants :

Defendant No. 9
Name : FNU Hughes
Job or Title (if known) : OFFICER
Shield Number : unknown
Employer : Bureau of Prisons
Address : USP Coleman II, 846 NE 54th Terrace
            Coleman,    FL.       33521

☑ Individual capacity ☑ Official capacity

And John/Jane Does.

Warden Lockett and all executive staff in charge
of supervisory action at Coleman USP 2, failed
in their capacity individual and official when
they posted memorandum during the pand-
emic emergency outlining in detail the testing
procedures, masks, social distance, etc..
In fact, congressman Marco Rubio person-
ally notified the staff at Coleman Complex to
assure that everyone use masks and abide by
the guideline set forth to prevent spread of
the COVID-19 virus, to no avail.
                              page 3(c) of 11

*For violation of 8th Amend., Cruel/Unusual Punishment*

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.

N/A

## III.   Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

☐   Pretrial detainee

☐   Civilly committed detainee

☐   Immigration detainee

☐   Convicted and sentenced state prisoner

☑   Convicted and sentenced federal prisoner

☐   Other *(explain)*   _____

## IV.   Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   If the events giving rise to your claim arose outside an institution, describe where and when they arose.

Outside Hospital U.S. Health Medical Center, Leesburg, FL. See Attached "STATEMENT OF CLAIM" EXHIBIT #1

B.   If the events giving rise to your claim arose in an institution, describe where and when they arose.

Coleman USP 2 See Attached "STATEMENT OF CLAIM" EXHIBIT #1

C.    What date and approximate time did the events giving rise to your claim(s) occur?

SEE ATTACHED "STATEMENT OF CLAIM" EXHIBIT #1

D.    What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

SEE ATTACHED "STATEMENT OF CLAIM" EXHIBIT #1

## V.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

SEE ATTACHED "MEDICAL DECLARATION OF DR. WILLIAM WEBER" EXHIBIT #2

## VI.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

According to CDC "LONG COVID" is ongoing factor in my health. As such, I request my health care be fully covered by federal government. The compensatory of $25,000,000. And due to their reckless disregard for my pain and suffering, I seek $100,000,000 in punitive damages.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## VII.   Exhaustion of Administrative Remedies Administrative Procedures

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures.  Your case may be dismissed if you have not exhausted your administrative remedies.

A.     Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

USP Coleman II, 846 NE 54th Terrace, Coleman, FL. 33521 (Also, U.S. Health Medical Center, Leasburg, FLORIDA

B.     Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑ Yes

☐ No

☐ Do not know

C.     Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☑ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

All claims were Address And denied.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.  Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☑ No

E.  If you did file a grievance:

1.  Where did you file the grievance?

USP Coleman II, 846 NE 54th Terrace, Coleman, FL. 33521

2.  What did you claim in your grievance?

Inadequate Medical Care During Emergency Pandemic

3.  What was the result, if any?

Denied

4.  What steps, if any, did you take to appeal that decision? Is the grievance process completed? If not, explain why not. *(Describe all efforts to appeal to the highest level of the grievance process.)*

Completed BP-8,9,10, And 11. Also, Tort Claim. All denied See Attached EXHIBIT #3

F.    If you did not file a grievance:

    1.    If there are any reasons why you did not file a grievance, state them here:

N/A _____

    2.    If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

N/A _____

G.    Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

See Attached "WITNESS LIST" EXHIBIT #4 _____

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII.  Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☑ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

NONE _____

A. Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☑ No

B. If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1. Parties to the previous lawsuit

   Plaintiff(s)  N/A

   Defendant(s)  N/A

2. Court *(if federal court, name the district; if state court, name the county and State)*

3. Docket or index number

4. Name of Judge assigned to your case

5. Approximate date of filing lawsuit

6. Is the case still pending?

   ☐ Yes

   ☑ No

   If no, give the approximate date of disposition.  N/A

7. What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

   None

C. Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

☐ Yes

☑ No

D.    If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.    Parties to the previous lawsuit
      Plaintiff(s)    N/A
      Defendant(s)    N/A

2.    Court *(if federal court, name the district; if state court, name the county and State)*

3.    Docket or index number    N

4.    Name of Judge assigned to your case

5.    Approximate date of filing lawsuit

6.    Is the case still pending?
      ☐ Yes
      ☑ No
      If no, give the approximate date of disposition    NONE

7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

      NONE

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    4/20/2023

Signature of Plaintiff

Printed Name of Plaintiff    Stephen Henderson

Prison Identification #    #34996-044

Prison Address    FCC, Coleman USP 2, P.O. 1034
Coleman,                    FL.    33521
                City                State    Zip Code

### B.    For Attorneys

Date of signing:    _____

Signature of Attorney    _____

Printed Name of Attorney    _____

Bar Number    _____

Name of Law Firm    _____

Address    _____
                City                State    Zip Code

Telephone Number    _____

E-mail Address    _____

TRULINCS 34996044 - HENDERSON, STEPHEN - Unit: CLP-K-B

---------------------------------------------------------------------------------------------

FROM: 34996044 HENDERSON, STEPHEN
TO:
SUBJECT: Statement of claim
DATE: 04/13/2023 10:30 AM

AFFIDAVIT of Stephen Henderson

I, Stephen Henderson, depose and state that the following facts are true and correct under the penalty of perjury to wit: On September 21, 2020 at USP Coleman II, 846 NE 54th Terrace, Coleman, Florida 33521, my c ellmate began complaining about not feeling well and complaining about chill and fever. On early morning the same day, he made a request to the officer to contact the medical department so he could be tested for COVID. By that afternoon Mr. Herrera, a member of the medical staff, arrived to test him and said I should be tested also. I was reluctant to be tested until Mr.. Herrera informed me I would be placed in solitary confinement. In addition, he noticed I had a dry cough which he indicated was a sign of COVID 19. I decided to take the test. Later that evening, several officers arrived to escort us to a quarantine unit. They claim we both tested positive for COVID. We remained there from September 21, 2020 until October 1, 2020. During that time, Mr.. Herrera and other medical staff would come around each day to check our temperature and vitals, then asked if we had any symptoms. At the time, I still had the dry cough and developed diarrhea while in quarantine, which I related to Mr.. Herrera. So on the 11th day without the opportunity of being retested, my cellmate and I were released from quarantine to our regular housing unit.

By the day, I became weaker and could barely stand up for a period of time or walk. I started to have little to no appetite, and could hardly drink. And since I couldn't eat or drink, I was unable to take my medications. My condition got worse and went on for (17) days even though my cellmate was making staff aware (my cellmate made Nurse Hankerson aware). To the best of my recollection she only took my temperature once or twice. She state that our temperature was fine. But she dismissed all of my symptoms. By the (18th) day, my condition had degraded to the point that I was no longer able to remember my combination number. My cellmate attempted to get the officer to unlock my locker, and he refused. My cellmate was so concerned about my condition that he asked officer Grant to contact medical. When the medical staff arrived, to the best of my recollection this is what I remember. Medical staff asked me, Can you walk, and I said no. So she brought the gurney in and placed me on it. I don't remember them doing anything else beside wheeling me to medical. The next thing I do remember is the paramedic saying "he is a goner". He attempted to get an IV into my arm, but was having difficulty finding a vein. I recall him saying "he is so dehydrated, I hope I can find a vein". At some point the paramedic eventually located a vein. From that point, I was taken to the hospital. Upon entry to the hospital I was retested and given a positive result. I spent several days from (Sunday, Oct. 18, 2020 until Thursday, Oct. 22, 2020) in the hospital.

When plaintiff was transferred to outside hospital at U.S. Health Medical Center, Leesburg, Florida, to be treated for COVID-19. At hospital since his arrival Officer Hughes kept stating "that it's urgent to release him (plaintiff) from hospital because it was costing them (officials) $15,000 per day to cure plaintiff", in clear wanton and willful disregard for my medical condition with deliberate indifference to plaintiff suffering and pains, etc.. Also, all medical staff not identified at this time, but did not object to Officer Hughes' demands, and released him from hospital knowing that plaintiff was at that time with elevated troponin, indicating injury to the heart, and renal failure with toxic buildup of substances in his blood. It was so bad that plaintiff could not even walk by himself.

On or about Sept, 2020 during Centers for Disease Control and Prevention (CDC) emergency guidelines, the medical department at USP Coleman II was supposed to conduct COVID 19 tests of all inmates with COVID 19 risk factors to prevent contagious spread to all inmates that were not infected. However, due to the deliberate indifference of the health service medical personnel, they failed to protect and prevent the spread of such serious infection by not providing periodic tests to the inmate population. Consequently, I was diagnosed with COVID 19, which not only revealed that I contracted COVID 19, but I also suffer from severe body aches, and am still suffering from "Long COVID", and until this day, health services still refuses to treat.

I, Stephen Henderson, declare under the penalty of perjury pursuant to 28 USC Section 1746, that the above stated facts are true and correct.

EXECUTED ON THIS __ DAY OF _____, 2023.

/S/

EXHIBIT
#1
1-OF-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Respondent*, | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | 4:08-CR00187-CAS |
| | ) | |
| STEPHEN HENDERSON, | ) | |
| | ) | |
| *Defendant-Petitioner.* | ) | |

<u>Motion to Reduce Sentence Pursuant to 18 U.S.C. §3582(c)(1)(A)(i)</u>

## **EXHIBIT B-2**

1. Medical Declaration of Dr. William Weber . . . . . . . . . . . . . . . . . . . . 1

2. Selected Medical Records from Leesburg Regional Hospital . . . . . . 9

Respectfully submitted,

*/s/Kevin C. Curran*
**Kevin C. Curran 29234 MO**
**Assistant Federal Public Defender**
**1010 Market Street, Suite 200**
**St. Louis, Missouri 63101**
**Telephone: (314) 241-1255**
**E-mail: Kevin_Curran@fd.org**

**ATTORNEY FOR MOVANT**

*EXHIBIT #2*

**Medical Declaration regarding the Medical Care of Stephen Henderson at the Federal Correctional Institution, Coleman**
**Reviewer: William Weber, MD, MPH**

Pursuant to 28 U.S.C. § 1746, I, Doctor William Weber,  declare as follows:

Qualifications:

1.  I am a board certified emergency physician licensed to practice in the States of Illinois and Wisconsin, practicing in the Emergency Department at the University of Chicago Medical Center. I have practiced emergency medicine for four years and have taught medical students and residents.

2.  I am a graduate of the Northwestern University Feinberg School of Medicine. I completed a residency in emergency medicine at the University of Chicago. This residency provided extensive experience in history taking and physical examination of adults and children. In my routine clinical care, I evaluate and treat patients with a wide variety of medical and psychiatric conditions, including patients under the custody of law enforcement agencies. I also completed a Master's Degree in Public Health at Northwestern University, where I focused on public safety and the epidemiology of disease.

3.  I am a subcommittee chair on the American College of Emergency Physicians (ACEP) Public Health and Injury Prevention Committee and have served on the committee since 2018. The American College of Emergency Physicians is the largest organized body of emergency physicians in the United States. Our committee writes national practice and policy statements pertaining to public safety and emergency care.

4.  I have reviewed medical records pertaining to the medical care of patients in carceral facilities scattered throughout the U.S. and have written over 60 medical declarations discussing care as it pertains to the National Detention Standards, Centers for Disease Control and Prevention (CDC) recommendations for carceral facilities, and accepted standards of medical care. I have taught over 80 physicians from various specialties how to review medical records and evaluate the care received by patients.

5.  I have prepared my review of the medical care on behalf of the client's legal team. The client is not my patient, nor have I had the opportunity to speak with them directly or conduct a physical exam. I do not have authority over the client's direct medical treatment or diagnosis.

6.  I have received no remuneration for my time reviewing this case or preparing this declaration; I have done so as a volunteer. Based on my review of approximately 600 pages of Mr. Henderson's medical records, I declare the following:

**Executive Overview**

7.  Mr. Stephen Henderson is a 52-year-old gentleman with medical problems including human immunodeficiency virus (HIV) infection, prediabetes, vision damage, high cholesterol, obesity, and kidney disease. Numerous conditions of Mr. Henderson's have not been appropriately evaluated or treated at FCI Coleman, putting him at higher risk of worsening health or death.

**High Cholesterol**

8.  On review of Mr. Henderson's medical records since 2020, he has met criteria for high cholesterol. Hyperlipidemia is a condition in which levels of cholesterol in the blood are elevated. Over time, this cholesterol can damage the blood vessels, putting the patient at risk for heart attacks, strokes, and poor blood flow to the extremities. Mr. Henderson has had multiple elevated total cholesterol measurements since 2020, including a total cholesterol of 209 on 12/17/2020 and a total cholesterol of 232 on 7/7/2021.

9.  The American College of Cardiology developed a calculator to estimate the chance that a patient will have a heart attack or stroke in the next 10 years. Mr. Henderson currently has a 9.8% chance, though this calculator does not take into account his positive HIV status (which raises his risk further). The American College of Cardiology and American Heart Association would recommend counseling on diet and exercise as well as starting a statin medication due to his high risk. Mr. Henderson should receive counseling about his risks and lifestyle changes he can make to improve them, as well as consideration of a cholesterol lowering medication and ongoing monitoring of his cholesterol levels.

**Obesity**

10. Mr. Henderson additionally has obesity, or excess body fat. Obesity is determined based on a patient's Body Mass Index (BMI). BMI is calculated from a patient's height and weight. A BMI greater than 25 is considered overweight, and greater than 30 is considered obese. Being obese increases the risk of a patient having high blood pressure and high cholesterol levels in the blood, which both increase the risk of cardiovascular events like heart attack and stroke.

11. Since 2020, Mr. Henderson's BMI has consistently been greater than 30, putting him the obese category. According to the American Heart Association guidelines, individuals with obesity should be provided with counseling and support with lifestyle changes such as exercise and weight loss. Based on the review of the records, it does not appear that Mr. Henderson has been counseled on his BMI and the associated risks of obesity.

**Prediabetes**

12. Diabetes mellitus is a group of diseases caused by high blood sugar. Type 2 diabetes mellitus is characterized by resistance to and decreased synthesis of insulin, a hormone made by the

2

pancreas that decreases blood sugar. Type 2 diabetes is the most common form of diabetes and is one of the major causes of early illness and death worldwide. As the disease progresses, the high blood sugar damages the person's organs, increasing the risk of kidney failure, blindness, strokes, heart attacks, and the need for limb amputation.

13. Type 2 diabetes has a gradual onset and can remain undiagnosed for many years due to a long asymptomatic phase. Symptoms of complications may be the first sign of disease, causing it to be diagnosed after damage to the organs has already begun. Because of this, testing for high blood sugar is recommended for asymptomatic patients who are at high risk of diabetes. Risk factors of Type 2 Diabetes include history of prediabetes, obesity, family history, race/ethnicity (increased risk for African Americans), history of cardiovascular disease, physical inactivity, high blood pressure, and high cholesterol. Mr. Henderson has numerous risks: obesity, high blood pressure, high cholesterol, and race/ethnicity. Testing for diabetes in asymptomatic patients can identify patients with prediabetes, or an elevated blood sugar that do not yet meet the criteria for diabetes. Patients with prediabetes are at very high risk of developing diabetes in the future.

14. One way to screen for prediabetes and diabetes is using Hemoglobin A1c (HbA1c). HbA1c is a blood test that measures the average blood sugar levels over the last 3 months. The American Heart Association defines prediabetes as a HbA1c level of 5.7-6.4%. Mr. Henderson has met the criteria for prediabetes on 3 separate occasions with a hemoglobin A1c of 5.8% on 1/7/2020 and 12/17/2020 and 6% on 5/5/2021. The American Heart Association and American Diabetes Association recommend that patients with prediabetes should be tested for diabetes yearly as well as counseling on how to lower his risk of developing diabetes. Although Mr. Henderson met the criteria for prediabetes, he did not appear to have counseling or a plan for lowering his risk of developing diabetes. Furthermore, he possesses multiple risk factors for progression to diabetes, including obesity, high blood pressure, high cholesterol, and being African American.

15. Untreated diabetes can lead to very serious health complications including heart attacks, strokes, and kidney failure. I recommend monitoring of glucose and A1c in accordance with the American Heart Association guidelines. Furthermore, I recommend comprehensive counseling and education for lifestyle modifications, including weight reduction, balanced diet and nutrition, and regular exercise.

**Kidney disease**

16. The kidneys are vital organs, responsible for maintaining the body's hydration level, pH, and electrolytes, as well as excreting toxic waste products. As kidneys age or are damaged, they lose their ability to filter the blood effectively. Kidney function can be temporarily decreased (acute kidney injury or AKI) or permanently decreased (chronic kidney disease or CKD).

17. During Mr. Henderson's Leesburg hospitalization for COVID-19 infection in 2020, Mr. Henderson developed severe kidney damage to the point that toxic substances were building up in his blood (10/18/20). While his kidney function improved after he recovered from COVID-19, he still has evidence of long term kidney damage (7/7/21). He was also found to have protein in his urine, an abnormal finding that suggests a problem with the kidneys (7/6/21). Mr. Henderson's diagnoses of hypertension (high blood pressure) and HIV put him at increased risk for worsening kidney disease.

18. Patients with kidney damage and protein in their urine should have further testing to determine the cause and treatment to protect the kidneys. Without appropriate monitoring and treatment, Mr. Henderson's kidney damage could progress to the point that his kidneys permanently fail and he would require dialysis to clean out toxins from his blood or a kidney transplant. He should be evaluated by a nephrologist (kidney doctor) to discuss testing and alternative medications that could help protect his kidney function. It is also important to continue monitoring his HIV and high blood pressure.

**Medications to lower heart risk**

19. Cardiovascular disease (CVD) is a group of disorders of the heart and blood vessels such as heart attacks or strokes. As discussed before, Mr. Henderson has numerous risk factors for developing CVD (e.g. high blood pressure, high cholesterol, obesity, prediabetes). Taking aspirin daily can help decrease the chance of heart attack and stroke in patients with high risk. The current US Preventive Services Task Force (USPSTF) aspirin guidelines in accordance with the American College of Cardiology state that adults ages 40 to 59 years with a 10% or greater 10-year CVD risk should be evaluated on an individual basis for low-dose aspirin primary prevention. As discussed before, Mr. Henderson's 10-year CVD risk is estimated to be 9.8%. However, this does not include any recent blood pressure measurements (only checked twice between 1/1/21 and 7/7/21) or account for his HIV status and may be higher than that. Given his numerous risk factors, he should have an updated risk calculation and consideration of daily aspirin to reduce his risk of heart attack and stroke.

**Heart damage**

20. During Mr. Henderson's hospitalization at Leesburg Regional Medical Center in October 2020, his troponin was found to be elevated. Troponin is a laboratory test that can indicate injury to the heart, including a heart attack. When a patient has elevated troponin levels, it is important to evaluate for serious heart injury with further monitoring of the levels and additional tests, such as an electrocardiogram (ECG). Mr. Henderson's troponin levels decreased during his daily checks. He also did receive an ECG during his hospitalization, which did not show evidence of an acute heart attack. He was evaluated by the heart specialists (cardiologists), who felt his elevated troponin level was likely due to his poor

kidney function rather than a heart attack or heart injury and did not pursue further heart workup.

21. Mr. Henderson has multiple conditions (high blood pressure, obesity, and high cholesterol) that increase his risk for a heart attack. His elevated troponin, while potentially due to his poor kidney function during his hospitalization, could also be due to heart disease. It was still above the normal level when he was released from the hospital and has not been monitored further. He should have a recheck of his troponin level to ensure that it has improved or stayed stable.

**Macrocytic anemia**

22. Anemia is a condition characterized by a decrease in the number of red blood cells that circulate throughout the body, resulting in the diminished ability to provide adequate oxygen to the tissues in the body. This can cause fatigue, shortness of breath, and increased heart rate, among several other generalized symptoms. There are many different forms of anemia caused by different factors. Macrocytic anemia is one such classification characterized by unusually large blood cells. This commonly occurs due to vitamin deficiencies, low iron levels, , or as a side effect to different medications.

23. Mr. Henderson's blood levels indicate a diagnosis of macrocytic anemia beginning on 10/20/20 through as recently as 5/5/21. Though these test results indicated Mr. Henderson has macrocytic anemia, he has had incomplete testing to determine the cause of his anemia. He was placed on iron and vitamin supplements without any evidence that these levels were low (1/6/21). He had his folate level checked and found to be normal, but did not have an evaluation of his iron levels or vitamin B12 levels [as of the end of the records we have]. While he was treated with medications to correct vitamin deficiencies, they did not correct his macroscopic anemia. Given the persistence of his condition, he should have further evaluation for other causes, likely by a hematologist (blood doctor).

**Glaucoma**

24. In the May 2021, Mr. Henderson was diagnosed with glaucoma, which is vision damage typically caused by high pressure within the eyes. If not diagnosed or untreated, glaucoma can lead to vision changes and even blindness. He was started on a medication, latanoprost, to lower the pressure in his eyes at that visit.

25. He will need continued follow up with an eye specialist, ophthalmologist, to continue to monitor his disease. From our records, his last visit with an ophthalmologist on 5/27/21. On page 68 of Stephen Henderson 2021 BOP Med records, it is noted that he should have a 1 month follow up from the above date. Per our available records, no follow up has occurred as of early July. These follow up appointments are imperative so the ophthalmologist can

adequately treat Mr. Henderson's glaucoma and prevent further damage to his eye/vision. We would formally recommend continued treatment with latanoprost and prompt follow up with ophthalmology for proper management of his glaucoma.

**Dental concerns**

26. People with HIV are at particular risk for oral health problems. HIV attacks cells in the body that fight infection which weakens the immune system and makes it harder to properly fight infections. Dental care is an integral piece of health care for patients with HIV because of their increased susceptibility to dental infections and other oral health problems.. Dental problems can be very painful, making it difficult for patients to chew or swallow which can lead to malnutrition and prevent them from taking their HIV medications putting them at increased risk of complications related to HIV. Furthermore, poor oral and dental health increases the risk for developing dental infections, putting patients with HIV at increased risk for serious illness from infection.

27. The American Dental Association recommends regularly scheduled appointments with a dentist to prevent oral health issues in patients with HIV and more frequent visits to treat gum disease. Mr. Henderson has a history of chronic dental issues, including chronic gum inflammation, dental cavities, and a cracked tooth.

28. Mr. Henderson made repeated attempts to seek dental care but was unable to be seen on multiple occasions due to COVID restrictions and dental staff meetings. Furthermore, at one visit it was noted that one of his teeth may require permanent restoration, but this was deferred for routine care and regular flossing was recommended instead. It does not appear that there was follow up for this condition or that any treatment or further evaluation was provided to him regarding this potentially serious health issue.

29. Untreated dental disease can cause permanent tooth loss, bone erosion, and infection. Patients with HIV are at risk of serious infection due to immunosuppression. Because of these risks, Mr. Henderson should have prompt dental follow up with a thorough evaluation to assess whether more extensive dental treatment is indicated in accordance with the American Dental Association. Additionally, he should have regular dental visits for necessary dental care and education about oral health given his increased risk from HIV.

**COVID-19 risk**

30. Mr. Henderson had a life-threatening COVID-19 infection that led to failure of multiple organ systems. He received his initial Moderna COVID-19 vaccinations on 1/6/21 and 2/3/21, but has not yet been offered a COVID-19 booster vaccination. The CDC recommends individuals over the age of 50 and individuals who are immunocompromised receive the booster vaccination as they are at an increased risk of infection as well as adverse

complications related to infection. It is recommended that Mr. Henderson receive the COVID-19 booster vaccination as he is within these guidelines recommended for further vaccination.

31. Despite Mr. Henderson having been vaccinated for COVID-19, he remains at high risk for further injury from the disease. The new omicron variant of COVID-19 has over 50 mutations that decrease the effectiveness of vaccines. While the variant is still being studied, preliminary lab tests have found that the antibodies formed by the Moderna vaccination are 50 times less effective at neutralizing the omicron variant.[1] Early findings suggest that a two dose vaccination like Mr. Henderson's is only around 33% effective at preventing infection and 70% effective at preventing hospitalization.[2] Mr. Henderson has a weakened immune system due to HIV and already required hospitalization for multiple organ failure during his last infection with COVID-19. While a booster vaccine would help decrease his risk, his prior severe infection is extremely concerning. The omicron COVID-19 variant has spread to nearly every state, including Florida. Furthermore, it has rapid spread, increasing from around 13% of US cases to 73% of 3% of new cases in just one week. Mr. Henderson has an extremely high risk of being exposed to COVID-19, especially since those in correctional facilities have higher rates of COVID-19 infection.

32. In summary, Mr. Henderson has numerous health concerns, many of which do not appear to be appropriately monitored or treated at FCI Coleman. He has numerous risk factors for heart attack and stroke, vision damage from glaucoma, kidney damage, and unaddressed dental problems. He has demonstrated previous severe infection with COVID-19 and the new omicron variant means that his prior vaccination does not provide strong protection against infection. I am very concerned that the combination of his numerous medical conditions and risk of exposure to the omicron variant put his health at extremely high risk if he remains at FCI Coleman. I strongly recommend consideration of alternative solutions beyond confinement at FCI Coleman in order to decrease Mr. Henderson's risk of death or serious injury.

In the interim while the court considers other potential solutions, I recommend the following:
- Prompt follow-up appointment with ophthalmology to monitor his glaucoma
- Monitoring of his troponin level to assess for ongoing heart damage
- Continued monitoring and treatment of his high blood pressure by American Heart Association guidelines
- Calculation of a ASCVD risk score and consideration of statin medication and daily aspirin to decrease his risk of stroke or heart attack
- Counseling on health changes to help his prediabetes, high blood pressure, and obesity

[1] https://www.medrxiv.org/content/10.1101/2021.12.15.21267805v1
[2] https://www.discovery.co.za/corporate/news-room#/documents/press-release-dot-pdf-417948

- Appropriate evaluation of his macrocytic anemia, preferably with a hematologist
- Ongoing monitoring of his A1c, weight, and cholesterol levels in accordance with American Heart Association guidelines
- Further evaluation of his kidney function and protein in his urine
- Provision of a COVID-19 booster shot to help decrease his risk of death or serious injury

Sincerely,

William Weber, MD, MPH
The University of Chicago

8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff-Respondent,* | ) | |
| | ) | |
| v. | ) | 4:08-CR000187-CAS |
| | ) | |
| STEPHEN HENDERSON, | ) | **FILED UNDER SEAL** |
| | ) | |
| *Defendant-Petitioner.* | ) | |

## Reply Exhibit A

Declaration of Dr. William Weber (July 5, 2022) ..............................1

Respectfully submitted,

/s/ *Kevin C. Curran*
Kevin C. Curran 29234MO
Federal Public Defenders Office
1010 Market, Suite 200
Saint Louis, MO 63101
(314) 241-1255
Facsimile: (314) 421-2177
Email: Kevin_Curran@fd.org

A copy of this sealed exhibit was emailed to Counsel for the Government, Assistant United States Attorney Tiffany G. Becker on July 5, 2022.

/s/ *Kevin C. Curran*
Kevin C. Curran 29234MO

**Medical Declaration regarding the Medical Care of Stephen Henderson at the Federal Correctional Institution, Coleman**
**Reviewer: William Weber, MD, MPH**

Pursuant to 28 U.S.C. § 1746, I, Doctor William Weber, declare as follows:

Qualifications:
1.  I am a board-certified emergency physician on faculty at Harvard Medical School and the Beth Israel Deaconess Medical Center. I completed my medical education and masters of public health at Northwestern University and my residency in emergency medicine and fellowship in global emergency medicine at the University of Chicago.

2.  I have prepared my review of the medical care on behalf of the client's legal team. The client is not my patient, nor have I had the opportunity to speak with them directly or conduct a physical exam. I do not have authority over the client's direct medical treatment or diagnosis.

3.  I have received no remuneration for my time reviewing this case or preparing this declaration; I have done so as a volunteer. Based on my review of the 62 pages of government response and Mr. Henderson's updated medical records, I declare the following:

**Overview**
4.  Mr. Stephen Henderson is a 52-year-old gentleman with medical problems including human immunodeficiency virus (HIV) infection, prediabetes, vision damage, high cholesterol, obesity, and kidney disease. Mr. Henderson likely remains at very high risk of death or serious illness from COVID-19, despite the partial vaccination provided by the facility. The updated records from the facility demonstrate a continuation of the poor care that Mr. Henderson has received at FCI Coleman, putting him at higher risk of worsening health or death.

**COVID-19 risk and FCI Coleman's response**
5.  With regards to COVID-19 vaccination, Mr. Henderson's numerous risk factors for severe COVID-19 and his weakened immune system should ensure that he is prioritized for vaccination. However, the government has not kept him up to date with COVID-19 vaccination. While he was finally provided a COVID-19 booster shot, the booster was delayed four months from when it was first recommended by the CDC. The government notes that he is now "fully vaccinated against COVID-19." However, at this point, he should have already had a *second* booster based on CDC guidelines.[1] Thus, it appears that Mr. Henderson's COVID-19 vaccination status is still not up-to-date.

---

[1] https://www.cdc.gov/media/releases/2022/s0328-covid-19-boosters.html

1

6. The Coleman II facility, where Mr. Henderson is located, remains at the highest level of BOP COVID-19 risk (operational level 3), indicating a high medical isolation rate (7% or greater) or high community transmission of COVID-19.[2] Over 1800 staff and incarcerated individuals have already contracted COVID-19 at Coleman, leading to 10 deaths.[3] Other more infectious omicron variants are beginning to spread, further increasing the risk that he will be exposed in the coming months.[4]

7. While vaccinations have been effective in reducing the aggregate risk of severe COVID-19 infection and death across the population, we should be cautious with applying population level data to specific individuals. The vast majority of men Mr. Henderson's age who contracted COVID-19 in 12/2020 were able to manage the infection at home and did not require hospitalization. However, Mr. Henderson's infection led to multi-organ failure and a prolonged ICU admission. At a *population* level, COVID-19 boosters help reduce hospitalization, but Mr. Henderson has a weakened immune system and multiple conditions; his prior infection has demonstrated the frailty of his health in the face of COVID-19. Mr. Henderson's vaccinations undoubtedly provide some level of protection, but his personal history with COVID-19 strongly suggests that population statistics do not provide an accurate risk assessment for him and he is still at high risk of death or serious injury if he were to contract COVID-19. His continued incarceration at the facility puts him at high risk for exposure to COVID-19 and likely high risk of severe illness or death.

**Kidney disease**

8. With regards to Mr. Henderson's kidney function, the government notes that his kidney function improved after his severe COVID-19 infection. They note that "his eGFR was above 60, therefore not suggesting any chronic kidney disease" (4). The government's statement is false. Mr. Henderson's calculated eGFR (an estimate of how much blood the kidneys can filter) is 72, which corresponds to stage 2 chronic kidney disease.[5]

**High blood pressure**

9. Regarding Mr. Henderson's blood pressure, the government notes that "his blood pressure is managed within the high normal range" (4). Between 1/1/2022 and 5/16/2022, his blood pressure was only checked on a single day and on that day fell in a range classified as hypertensive (high blood pressure) by the American Heart Association and American College of Cardiology guidelines (13).[6] The government notes that Mr. Henderson has been taking his blood pressure medication daily, but the facility has not been regularly monitoring

---

[2] https://www.bop.gov/locations/institutions/clp/
[3] https://www.bop.gov/coronavirus/
[4] www.latimes.com/california/story/2022-07-02/covid-persistent-threat-in-california-thanks-to-ba-4-ba-5
[5] www.mdcalc.com/calc/3939/ckd-epi-equations-glomerular-filtration-rate-gfr
[6] https://www.ahajournals.org/doi/10.1161/hyp.0000000000000065?cookieSet=1

2

his blood pressure or adjusting his medication even when his blood pressures fall into a hypertensive category.

**Obesity**

10. Mr. Henderson has class 2 obesity. The American Endocrine Society (obesity specialists) guidelines recommend that patients with obesity such as Mr. Henderson should be evaluated for methods beyond diet and exercise to help with weight loss such as medications or surgery. Mr. Henderson has already participated in exercise programs, showing an interest in losing weight. He should have an evaluation for other methods of weight loss that could also help improve his prediabetes, high blood pressure, and high cholesterol.

**The facility's repeated failure to provide appropriate care**

11. The government dismisses the other specific concerns raised about Mr. Henderson's care in my first declaration and notes that, "to the contrary, review of Henderson's medical records in total demonstrate that Henderson regularly receives regular and attentive care" (7). This statement is unsubstantiated and fails to address the numerous problems with his medical care. The government's apparent defense of the care provided and unwillingness to acknowledge or address these problems raises significant concerns about their ability to provide safe medical care for Mr. Henderson. Their failure to provide care in alignment with multiple established national guidelines and their significant delays in care jeopardize Mr. Henderson's health. The following are some examples that refute their assertion:

12. **Heart disease management:** Mr. Henderson has numerous risk factors for heart disease (e.g. obesity, high blood pressure, high cholesterol, pre-diabetes). Based on American College of Cardiology and American Heart Association guidelines, Mr. Henderson should be treated with a statin medication to lower his risk of heart attack and stroke.[7] The facility has not recognized his longstanding risk or treated him in alignment with national guidelines despite our raising the concern months ago. The new records also did not include a cholesterol panel (e.g. total cholesterol, triglycerides, HDL) to monitor his previously-elevated cholesterol levels.

13. **Anemia:** Mr. Henderson has anemia, a low number of red blood cells. He was diagnosed in 10/2020 and his condition has persisted despite vitamin supplementation. Despite our raising concerns about this persistent issue, the facility has still not provided Mr. Henderson with further evaluation in accordance with strong recommendations by the American Gastroenterological Association - such as lab testing and endoscopy to evaluate for colon cancer.[8] The failure to provide an appropriate evaluation 20 months after identifying the

---

[7]

https://www.acc.org/latest-in-cardiology/ten-points-to-remember/2019/03/07/16/00/2019-acc-aha-guideline-on-prim ary-prevention-gl-prevention

[8] https://www.gastrojournal.org/article/S0016-5085(20)34847-2/fulltext

problem does not suggest regular or attentive care and puts him at risk for undiagnosed cancer or other life-threatening conditions.

14. **Glaucoma**: On 5/27/2021, Mr. Henderson's ophthalmologist told him to follow up in one *month* for monitoring of his glaucoma. As of 5/16/2022 [the end of the updated records], Mr. Henderson had still not been reevaluated by ophthalmology for his glaucoma. Waiting a year for an appointment that should have been scheduled in a month is an extremely long delay in care that risks irreversible damage to his vision. The facility has failed to provide the care recommended by the BOP ophthalmologist, despite our raising the concern months ago. Their care of his eye condition is neither regular nor attentive.

15. **Dental concerns:** Mr. Henderson has chronic dental issues, including chronic gum inflammation, dental cavities, and a cracked tooth. It appears that his last dental appointment was took place in 12/2020. The American Dental Association recommends regularly scheduled appointments with a dentist to prevent oral health issues in patients with HIV and more frequent visits to treat gum disease, generally at least twice yearly. As discussed previously, Mr. Henderson has made repeated attempts to seek dental care but was unable to be seen on multiple occasions due to COVID restrictions and dental staff meetings. This long delay in providing basic dental care puts him at risk of permanent tooth loss as well as other bodily infections from dental decay. The failure to provide basic dental services to Mr. Henderson despite his repeated requests and national guidelines does not suggest regular or attentive care.

16. **Prediabetes:** Mr. Henderson has prediabetes. Given his age, obesity, and other risk factors, the American Diabetic Association recommends that patients with prediabetes should be strongly considered for treatment with metformin to lower their blood sugar.[9] However, the facility has not considered treatment with a medication. Appropriate treatment could delay onset of diabetes and potentially prevent damage to his organs from high blood sugar.

17. **Foot pain:** On 5/5/2022, Mr. Henderson reported burning and tingling pain in his feet since 2020 that was now 7/10 in severity. The provider who evaluated him did not document a foot exam (e.g. looking at the skin, checking sensation, checking strength), did not discuss any possible diagnoses, did not provide anything to alleviate Mr. Henderson's pain, and provided no follow-up except for "follow-up at sick call as needed" (6). Such a cursory evaluation is disturbing and risks missing many possible causes such as nerve damage from elevated blood sugars. Such care shows little regard for Mr. Henderson's ongoing pain or dire medical condition. While incarcerated, Mr. Henderson has no alternative places to seek adequate care that could treat or prevent further damage to his health. The fact that the government has

---

9

diabetesjournals.org/care/article/44/Supplement_1/S34/30895/3-Prevention-or-Delay-of-Type-2-Diabetes-Standards

reviewed these same records and still asserts that Mr. Henderson is receiving "consistent, quality care" is deeply disturbing (2).

18. The government acknowledges that at sentencing Mr. Henderson was "in good health with no reported medical conditions" (5). While incarcerated, he has developed numerous, serious medical conditions, to which his poor medical care in prison has contributed. Statements by the government such as "defendant is being provided consistent, quality care for his conditions" (2) are false and contrary to multiple, well-established national guidelines. Their assertion that he is receiving "regular and attentive care" (7) is contradicted by numerous examples of significantly delayed care that even defies the recommendations of specialists within the BOP.

**Professional opinion**

19. Based on my review of Mr. Henderson's medical records, I believe that due to his immunocompromised state and medical problems, he likely remains at very high risk for death or severe illness were he to contract COVID-19. Furthermore, the facility remains at a high risk level for COVID-19 and new, more infectious variants are beginning to circulate. Mr. Henderson's specific history with COVID-19 and medical problems are extraordinary circumstances.

20. The updated records redemonstrate the extremely poor care that Mr. Henderson is receiving at FCI Coleman. For instance, he has numerous risk factors for heart attack and stroke but has not received the common type of medication to lower these risks, he has vision damage from glaucoma but the follow-up appointment recommended by ophthalmology has been severely delayed, as has evaluation of his dental problems. The government makes numerous statements about him receiving "quality" care that are false and misleading. Such an assessment of his care raises further concerns about the facility's ability to handle someone with such numerous and severe medical problems. I strongly recommend consideration of compassionate release from FCI Coleman in order to decrease Mr. Henderson's risk of death or serious injury.

Sincerely,                                                                          7/5/2022

William Weber, MD, MPH

Medical

COC 1330.17.B
May 22, 2015
Attachment A

## INFORMAL RESOLUTION FORM

NOTICE TO INMATE: Bureau of Prisons Program Statement 1330.16 requires that except as provided in 542.13(b) an inmate shall first present an issue of concern informally to staff and staff shall informally attempt to resolve the issue prior to submitting a BP-9. A separate form must be used for each issue.

*********************************************************************************************

INSTRUCTIONS: Counselors will complete and attach this form to each Request for Administrative Remedy Form (BP-9) submitted, if not informally resolved.

Henderson, Stephen        34996-044        K-2        [signature]

| Inmate Name | Register No. | Qtrs./Unit | Inmate Signature |

1.  Specific complaint (one 8 ½" x 11" continuation page may be attached):

For complaint, see attached

2.  What efforts have been made by the inmate to resolve the complaint informally? To whom has the inmate spoken?

Contacted Coleman II, Health Services medical staff. Spoke to Unit Officers on duty (Ms. Collins, Mr. Grant, and Doctor Dinis) and Health Services Members (Mr. Herrera and Ms. Hunkerson).

3.  What action does the inmate wish to be taken to correct the issue?

For my medical issues to be addressed properly and get someone to take care of my medical problems.

Correctional Counselor's Comments (including actual steps taken to resolve):

You were medically evaluated during your chronic care visit on 5/5/22 & Your medical concerns were addressed

Brazill        5/7/22        Staff Circle One:

| Correctional Counselor | Date | Informally Resolved    Not Informally Resolved |

Unit Manager's Review

[signature]        5/11/22

| Unit Manager | Date |

Distribution by Correctional Counselor:

1.  If complaint is informally resolved, maintain original on file in the Unit.

2.  If complaint is not informally resolved, attach original to BP-9 Form and forward to Administrative Remedy Clerk for processing.

| | Inf. Resolution Form Issued to Inmate | Inf. Resolution Form Returned to Counselor | BP-9 Issued to Inmate | BP-9 Returned to Counselor | BP-9 Delivered to Admin Remedy Clerk |
|---|---|---|---|---|---|
| Date: | 4/15/22 | 4/29/22 | 5/11/22 | 5/11/22 | 5/23/22 |
| Time: | 11:15 | 10:15 | 1:00 pm | 1:55 pm | 8:06a |
| Counselor: | Brazill | Brazill | Brazill | Brown | |

EXHIBIT
#3
1-OF-16

TRULINCS  34996044 - HENDERSON, STEPHEN - Unit: CLP-K-B

--------------------------------------------------------------------------------

FROM: 34996044
TO:
SUBJECT: BASISOF CLAIM:
DATE: 04/24/2022 07:39:59 PM

AFFIDAVIT of Stephen Henderson

I, Stephen Henderson, depose and state that the following facts are true and correct under the penalty of perjury to wit:
On September 21, 2020 at USP Coleman II, 846 NE 54th Terrace, Colman , Flo. 33521, my cellmate began complaining about not feeling well and complaining about chill and fever. On early morning the same day, he made a request to the officer to contact the medical department so he could be tested for COVID. By that afternoon MR Herrera a member of the medical staff arrived to test him and said I should be tested also. I was reluctant to be tested until Mr.. Herrera informed me I would be placed in Solitary confinement. In addition, he noticed I had a dry cough which he indicated was a sigh of COVID 19. I decided to take the test. Later that evening several officers arrived to escorted us to a quarantine unit. They Claim we both tested Positive for covid. We remain there from Sept. 21 2020 until Oct. 1, 2020. During that time Mr.. Herrera and other medical staff would come around each day to check our temperature and vitals, then asked if we had any symptoms. At the time, I still had the dry cough and developed diarrhea while in quarantine, which I related to Mr.. Herrera. So on the 11th day without the opportunity of being retested my cellmate and I were released from quarantine to our regular housing unit.

By the day, I became weaker and could barely stand up for a period of time or walk. I started to have little to no appetite, and could hardly drink. And since I couldn't eat or drink, I was unable to take my medications. My condition got worse and went on for (17) days even though my cellmate was making staff aware. (My cellmate made Nurse Hankerson aware). To the best of my recollection she only took my temperature once or twice. She stated that our Temperature was fine. But, she dismissed all of my symptoms. By the (18)th day, my condition had degraded to the point that I was no longer able to remember my combination number. My cellmate attempted to get the officer to unlock my locker, and he refused. My cellmate was so concerned about my condition, that he asked officer Grant to contact Medical. When the medical staff arrived, To the best of my recollection this is what I remember. Medical staff asked me, Can you walk, and I said no. So they brought the gurney in and place me on it. I don't remember them doing anything else beside wheeling me to medical. The next thing I do remember is the paramedic saying "he is a goner." He attempted to get an IV into my arm, but was having difficulty finding a vein. I recall him saying "He is so dehydrated, I hope I can find a vein." At some point the Paramedic eventually located a vein. From that point, I was taken to the hospital. Upon entry to the hospital I was retested and given a positive result. I spent several days from (Sunday, Oct. 18, 2020 until Thursday, Oct. 22, 2020) in the hospital.

On or about Sept, 2020 during Centers for Disease Control and Prevention (CDC) emergency Guidelines, the medical department at USP Coleman II was suppose to conduct COVID 19 test of all inmates with Covid 19 Risk Factors to prevent contagious spread to all inmates that were not infected. However, due to the deliberate indifference of the health service medical personnel, they failed to protect and prevent the spread of such serious infection by not providing periodic tests to the inmate population. Consequently, I was diagnosed with COVID 19, which not only revealed that I contracted COVID 19, but I also suffer from severe body aches [long covid] that was not present before.
I, Stephen Henderson, delare under the penalty of perjury pursuant to 28 USC Section 1746, that the above stated facts are true and correct.

EXECUTED ON THIS 28 DAY OF  April , 2022.

/S/

Response to Administrative Remedy Case Number: 1121604-F1

This is in response to your Request for Administrative Remedy 1121604-F1 received in our office on May 26, 2022, in which you state your medical concerns were not addressed by Health Services in October 2020, because you were not tested for COVID-19 per CDC guidelines.

An investigation into this matter was conducted and Bureau of Prison (BOP) Electronic Medical Records (BEMR) revealed you are a 52-year-old male assigned to FCC Coleman USP-2 as a Care Level 2 medically assigned inmate with a medical history of HIV, anemia, hypertension and allergic rhinitis. Records indicate you were evaluated via the BOP Chronic Care Clinic with no significant findings on May 5, 2022. You are currently prescribed with Atenolol, Vitamin B-12, Genova, Iron, Folic Acid, Hydrochlorothiazide and Latanoprost eye drops.

In regards to your complaints of management of COVID-19 at FCC Coleman USP-2 in October 2020, a review of your medical records indicate you were evaluated by the medical provider on September 21, 2020, for your complaint of dry cough. You denied other COVID-19 symptoms such as, shortness of breath, fever or chills, fatigue, muscle or body aches, headache, new loss of taste, sore throat, congestion or runny nose, nausea or vomiting, or diarrhea. At the time, you tested positive for COVID-19 and were placed in medical isolation per BOP COVID-19 guidelines. Upon completion of the isolation period, you were re-evaluated by a medical provider on October 1, 2020. You reported feeling well and denied any symptoms. Your exam showed no evidence of respiratory distress. You were medically cleared to be released from isolation per BOP guidelines. On October 18, 2020, you were seen for evaluation with complaints of generalized weakness and not eating for several weeks. You were sent to the local Emergency Department for further evaluation and discharged on October 22, 2020, back to the institution. A review of your hospital records showed that at the Local Hospital you were diagnosed and treated for acute renal failure, COVID-19, dehydration, generalized weakness and high troponin levels.

Since your diagnosis of COVID-19 on September 21, 2020, you have been evaluated as followed; on November 12, 2020, you were evaluated by a medical provider for your complaint of bilateral leg swelling. As a result, blood pressure medication- diuretics were re-started to treat your fluid retention. On February 25, 2021, you were evaluated by a medical provider for your complaint of left hip pain for one week. You reported leg swelling improvement since restarting your blood pressure medication. You reported chronic fatigue, consistent with your chronic history of anemia. On May 5, 2021, you were evaluated by the physician for your annual Chronic Care encounter with no significant findings. On May 5, 2022, you were again evaluated by the physician for your annual Chronic Care encounter with no significant findings.

Currently, your medical conditions and complaints have been addressed in accordance with BOP Practice Guidelines. In addition, you have not presented nor been diagnosed

with "long COVID" aka post COVID conditions. Please continue to use the sick call and BOP Chronic Care Program for your medical concerns.

It is the Policy of FCC Coleman and the Federal Bureau of Prisons to provide evidence based proven effective medical care in accordance with approved Clinical Practice guidelines. Accordingly, this response is for Informational Purposes Only.

If you are dissatisfied with this response, you may appeal by filing a BP-10 to the Bureau of Prisons, Southeast Regional Office, Attn: Regional Director, 3800 Camp Creek Parkway, SW, Building 2000, Atlanta, GA 30331-6226, within 20 calendar days from the date of this response.

R. C. Cheatham, Warden

7/13/2022
Date

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Henderson, Stephen A.    34996-044    K-2    USP Coleman II
_____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A- INMATE REQUEST** My medical issues were not addressed. Normally I see Doctor Venuto. I met with a new medical member who wouldn't identify himself as a Doctor or other even after I asked a few times "Are you the new doctor?" His answer's were misleading. He only asked me questions that made no sense and even claimed the issues were from side effects of my medications. When I asked him to show me this on the med's side effect when he tried he found none - I believe he was there to try and make a false link between my medical issues and the med's without me ever having them before COVID. I don't agree with the respons given to my BP-8 because of continued Deliberate Indifference in failing to provide adequate medical care and my medical issues have not been addressed.

5/13/22
_____
DATE

_____
SIGNATURE OF REQUESTER

**Part B- RESPONSE**

Recv'd 5·26·22

_____        _____
DATE                            WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE        CASE NUMBER: 1121604-F1

                                  CASE NUMBER: _____

**Part C- RECEIPT**
Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____        _____
DATE                            RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982

Regional Administrative Remedy Appeal No: 1121604-R1
Part B - Response

This is in response to your Regional Administrative Remedy Appeal receipted August 1, 2022. You allege Centers for Disease Control and Prevention (CDC) guidelines calls for the testing of all inmates who have COVID-19 risk factors to prevent the spread of the virus. You further claim you contracted COVID-19 in September 2020 because Health Services failed to conduct periodic testing and you now suffer with long COVID symptoms of severe body aches. You did not request any specific relief.

Efforts to contain the spread of COVID-19 are based on guidance from key stakeholders; including the Centers for Disease Control and Prevention (CDC), World Health Organization (WHO) and the US Department of Justice (DOJ). The BOP Pandemic Response Plan outlines containment strategies that are followed in all federal prisons. The strategies include; environmental cleaning/disinfection/sanitation, health and hygiene practices, hand hygiene, screening for COVID-19 symptoms, isolation/quarantine, personal protective equipment and social distancing. All inmates with symptoms consistent with or suggestive of COVID-19 will be tested and placed in isolation. Asymptomatic inmates with known or suspected contact with a COVID-19 case will be tested and placed into quarantine or isolation, based on test results or the presence of symptoms.

A review of your medical records revealed you were seen in the clinic on September 21, 2020, when you voiced complaints of dry cough for "a couple of days". You denied having the following symptoms: chills, fever, fatigue, muscle and body aches, loss of smell, headache, sore throat, congestion, runny nose, nausea, vomiting and diarrhea. You tested positive for COVID-19 and were placed in isolation. A follow-up examination was performed on October 1, 2020, at which time you stated you were feeling well.

On October 18, 2020, you were seen in the clinic for complaints of weakness and a loss of appetite for the past few weeks. After assessing your condition, a decision was made to transport you to the local hospital for further evaluation. You were admitted to the hospital for treatment of acute renal failure, COVID-19, dehydration, generalized weakness and high troponin levels. You returned to the institution in stable condition on October 22, 2020.

You are a care level 2 inmate and your chronic medical conditions are being closely followed in the Chronic Care Clinics (CCC). You were seen in the CCC on May 5, 2022, at which time your chronic care medications were renewed and you were educated on diet and weight loss. Should you experience any adverse changes in your condition, return to sick call for reevaluation. Medical care will continue to be provided consistent with Bureau of Prisons' policy.

Accordingly, this response to your Regional Administrative Remedy Appeal is for informational purposes only. If dissatisfied with this response, you may appeal to the Office of General Counsel. Your appeal must be received in the Office of General Counsel, Bureau of Prisons, 320 First Street, NW, Washington, DC, 20534, within 30 calendar days of the date of this response.

_8/31/2022_
Date

_____
Regional Director, SERO

**U.S. Department of Justice**

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Henderson Stephen A.          349096-044     K-2          Coleman USP, 2
      LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT            INSTITUTION

**Part A - REASON FOR APPEAL**

I do not Agree with the institutional response because, the Warden in its response dismisses the other specific concerns raised About my care in my Medical Records And notes that "your medical conditions And complaints have been Addressed in Accordance with BOP Practice Guidelines." This statement is unsubstantiated and fails to Address the numerous problems with my medical care, And Are false And contrary to multiple well-established national guidelines.

7-26-2022
DATE                                                        SIGNATURE OF REQUESTER

**Part B - RESPONSE**

DATE                                                        REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

SECOND COPY: RETURN TO INMATE                           CASE NUMBER: 1121604

**Part C - RECEIPT**

                                                        CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT        INSTITUTION

SUBJECT: _____

DATE                                                        SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-230(13)
JUNE 2002

UPN LVN

RECEIPT - ADMINISTRATIVE REMEDY


DATE: OCTOBER 6, 2022



FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

TO  : STEPHEN HENDERSON, 34996-044
      COLEMAN II USP    UNT: K-2    QTR: K02-107L



THIS ACKNOWLEDGES THE RECEIPT OF THE CENTRAL OFFICE APPEAL
IDENTIFIED BELOW:

REMEDY ID       : 1121604-A1
DATE RECEIVED   : SEPTEMBER 27, 2022
RESPONSE DUE    : NOVEMBER 26, 2022
SUBJECT 1       : MEDICAL CARE - IMPROPER OR INADEQUATE
SUBJECT 2       :

EXTENSION OF TIME FOR RESPONSE - ADMINISTRATIVE REMEDY

DATE: OCTOBER 6, 2022

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

TO  : STEPHEN HENDERSON, 34996-044
      COLEMAN II USP    UNT: K-2    QTR: K02-107L

ADDITIONAL TIME IS NEEDED TO RESPOND TO THE CENTRAL OFFICE APPEAL
IDENTIFIED BELOW.  WE ARE EXTENDING THE TIME FOR RESPONSE AS PROVIDED
FOR IN THE ADMINISTRATIVE REMEDY PROGRAM STATEMENT.

REMEDY ID       : 1121604-A1
DATE RECEIVED   : SEPTEMBER 27, 2022
RESPONSE DUE    : NOVEMBER 26, 2022
SUBJECT 1       : MEDICAL CARE - IMPROPER OR INADEQUATE
SUBJECT 2       :

**Administrative Remedy No. 1121604-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal wherein you allege deliberate indifference since you have not received adequate medical care for chronic medical issues. You contend Health Services failed to perform periodic testing that resulted in pain and suffering and delay to your medical needs. You do not request any specific relief.

We have reviewed documentation relevant to your appeal and, based on our findings, concur with the manner in which the Warden and Regional Director responded to your concerns at the time of your Request for Administrative Remedy and subsequent appeal. Our succeeding review reveals you have been evaluated by Health Services on several occasions for your medical concerns and have had adjustments in your health care as clinically needed. If you are having specific issues, you need to request sick call for your complaints. Your primary care team will continue to make recommendations as needed. As recommendations are made, a course of treatment will be determined. Given this, we shall defer diagnostic testing and treatment interventions to the Health Services staff at the local level.

Based on this information, there is no evidence to substantiate your claim of being denied appropriate or delayed medical care. We find no evidence to substantiate your contention of deliberate indifference on the part of medical staff; therefore, we find no rationale warranting further review of your claim.

The record reflects you have received medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau of Prisons. You are encouraged to comply with proposed medical treatment so Health Services can continue to provide essential care and to contact medical personnel through routine sick call procedures should your condition change.

Considering the foregoing, this response is provided for informational purposes only.

October 17, 2022
Date

_S. Connors_
Ian Connors, Administrator
National Inmate Appeals

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Henderson Stephen, A.    #34996-044    K-2    Coleman USP,
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL**

I don't agree with the Administrative Remedy Appeal response due to the fact that the Health Services, Chronic Care Clinic (CCC) has not and is providing adequate medical care to my chronic medical conditions. Accordingly, Health Services failed to conduct periodic testing, that further demonstrate Deliberate Indifference and Wanton and Willful disregard to medical conditions causing me pain and suffering as a result of their delay to my medical needs. Moreover, no matter how sick you become or many complaints you file, other than your Annual Chronic Care visit, the cli will not have a Medical Doctor see you until a year have elapsed from the l have he seen you. in violation of the Cruel and Unusual Punishments Clau of the 8th Amendment and the Due Process Clause of the 5th Amendment to U.S. Constitution. Administrative Remedy should not be delayed and is necessary to correct such violations to my Constitutional Rights.

9-18-2022
DATE

_Steph_
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

SEP 27 2022

Administrative Remedy Sectio
Federal Bureau of Prison

_____
DATE

ORIGINAL: RETURN TO INMATE

GENERAL COUNSEL

CASE NUMBER: _112160744_

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____
DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN

PRINTED ON RECYCLED PAPER

BP-231(13)
JUNE 2002



U.S. Department of Justice
**Federal Bureau of Prisons**
*Federal Correctional Complex*
P.O. Box 1029
Coleman, Florida   33521-1029

**CERTIFIED MAIL**
**7018 0040 0000 6274 3408**

November 15, 2022

Stephen Henderson
Reg. No. 34996-044
FCC Coleman, USP-2
P.O Box 1034
Coleman, Florida    33521

**RE:     Administrative Tort Claim Number TRT-SER-2022-05450**

Dear Claimant:

The Bureau of Prisons (BOP) has considered your claim under the Federal Tort Claims Act (FTCA), Title 28 United States Code (U.S.C.) Section 2672 et seq., and authority granted by Title 28 Code of Federal Regulations (C.F.R.) Section 0.172.  Section 2672 of the FTCA delegates to each federal agency the authority to consider, determine and settle any claim for money damages against the United States for loss of personal property or injury caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment.

You claim that due to Bureau staff negligence, you were infected with the COVID-19 virus on or about September 21, 2020.  As a result, you claim you now suffer various medical conditions due to your COVID-19 infection.  As compensation, you seek $4,000,000.00.

Staff investigated your claim, including a review of your medical records.  Your records indicate that on September 21, 2020, medical staff responded to your complaint of having a dry cough.  During the examination, you denied having any symptoms of COVID-19, but as a precaution, you were tested for the COVID-19 virus.  Your test was positive, so you were appropriately placed in quarantine.  On October 1, 2020, you were released from quarantine and allowed to return to your housing unit.  Over the next several months medical staff continued to provide timely and adequate medical treatment when needed, including sending you to the local hospital for further evaluation and treatment.  Medical staff continues to see you when medically necessary while monitoring your chronic conditions.  Staff has also provided appropriate medication to help treat your chronic illnesses.  Contrary to your claim, there is no evidence that any chronic issues are related to your previous COVID-19 diagnosis.

You have failed to provide any evidence to indicate that you have sustained a compensable injury or loss caused by the negligent or wrongful act or omission of any Bureau of Prisons employee acting within the scope of their employment.  While at FCC Coleman you received evidence-based proven effective medical care in accordance with policy and standards.  As such, your claim is denied.

You are advised that if you are dissatisfied with our determination in this letter, you are afforded six (6) months from the date of the mailing of this communication within which to bring suit in the appropriate United States District Court.

Sincerely,

Jeff Middendorf
Supervisory Attorney

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Federal Bureau of Prisons<br>Southeast Regional Office<br>3800 North Camp Creek Parkway, SW<br>Building 2000<br>Atlanta, GA. 30331 | Stephen Henderson #34996-044<br>USP Coleman II<br>P.O. Box 1034<br>Coleman, FL. 33521 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☑ CIVILIAN | 11-27-1969 | Single | September 21, 2020 | |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

For basis of Claim, see attached

---

9. PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

---

10. PERSONAL INJURY/WRONGFUL DEATH

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

I contracted and was hospitalized with COVID-19 at USP Coleman II and due to injuries. I am disabled. Since released from hospital I experience body aches. Also see attached (Physician Declaration of Medical condition).

---

11. WITNESSES

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Leon A. Frederick<br>#86340-004<br>Medical Records, (BOP) | USP Coleman II<br>P.O. Box 1034<br>Coleman, FL. 33521 |

12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| none | 4,000,000 | none | 4,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| | none | 5/6/2022 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

TRULINCS 34996044 - HENDERSON, STEPHEN - Unit: CLP-K-B

--------------------------------------------------------------------------------

FROM: 34996044
TO:
SUBJECT: BASISOF CLAIM:
DATE: 04/24/2022 07:39:59 PM

AFFIDAVIT of Stephen Henderson

I, Stephen Henderson, depose and state that the following facts are true and correct under the penalty of perjury to wit:
On September 21, 2020 at USP Coleman II, 846 NE 54th Terrace, Colman , Flo. 33521, my cellmate began complaining about not feeling well and complaining about chill and fever. On early morning the same day, he made a request to the officer to contact the medical department so he could be tested for COVID. By that afternoon MR Herrera a member of the medical staff arrived to test him and said I should be tested also. I was reluctant to be tested until Mr.. Herrera informed me I would be placed in Solitary confinement. In addition, he noticed I had a dry cough which he indicated was a sigh of COVID 19. I decided to take the test. Later that evening several officers arrived to escorted us to a quarantine unit. They Claim we both tested Positive for covid. We remain there from Sept. 21 2020 until Oct. 1, 2020. During that time Mr.. Herrera and other medical staff would come around each day to check our temperature and vitals, then asked if we had any symptoms. At the time, I still had the dry cough and developed diarrhea while in quarantine, which I related to Mr.. Herrera. So on the 11th day without the opportunity of being retested my cellmate and I were released from quarantine to our regular housing unit.

By the day, I became weaker and could barely stand up for a period of time or walk. I started to have little to no appetite, and could hardly drink. And since I couldn't eat or drink, I was unable to take my medications. My condition got worse and went on for (17) days even though my cellmate was making staff aware. (My cellmate made Nurse Hankerson aware). To the best of my recollection she only took my temperature once or twice. She stated that our Temperature was fine. But, she dismissed all of my symptoms. By the (18)th day, my condition had degraded to the point that I was no longer able to remember my combination number. My cellmate attempted to get the officer to unlock my locker, and he refused. My cellmate was so concerned about my condition, that he asked officer Grant to contact Medical. When the medical staff arrived, To the best of my recollection this is what I remember. Medical staff asked me, Can you walk, and I said no. So they brought the gurney in and place me on it. I don't remember them doing anything else beside wheeling me to medical. The next thing I do remember is the paramedic saying "he is a goner." He attempted to get an IV into my arm, but was having difficulty finding a vein. I recall him saying "He is so dehydrated, I hope I can find a vein." At some point the Paramedic eventually located a vein. From that point, I was taken to the hospital. Upon entry to the hospital I was retested and given a positive result. I spent several days from (Sunday, Oct. 18, 2020 until Thursday, Oct. 22, 2020) in the hospital.

On or about Sept, 2020 during Centers for Disease Control and Prevention (CDC) emergency Guidelines, the medical department at USP Coleman II was suppose to conduct COVID 19 test of all inmates with Covid 19 Risk Factors to prevent contagious spread to all inmates that were not infected. However, due to the deliberate indifference of the health service medical personnel, they failed to protect and prevent the spread of such serious infection by not providing periodic tests to the inmate population. Consequently, I was diagnosed with COVID 19, which not only revealed that I contracted COVID 19, but I also suffer from severe body aches [long covid] that was not present before.
 I, Stephen Henderson, delare under the penalty of perjury pursuant to 28 USC Section 1746, that the above stated facts are true and correct.

EXECUTED ON THIS 28 DAY OF ~~April~~ , 2022.

/S/

# Feds Declare Long COVID a Disability Under ADA, RA and ACA

### by Ed Lyon

THE COVID-19 PANDEMIC IS NOW A well-known, world-wide fact of life. Less well known is a lingering set of 4 that afflict some people infected with the disease, which the medical establishment has labeled "Long COVID."

Some of Long COVID's common symptoms include tiredness or fatigue, cognitive difficulties or "brain fog," headaches, dizziness — especially when standing up — and shortness of breath or difficulty breathing, along with heart palpitations or pounding, fast heartbeat, chest pain, coughing, persistent or intermittent fever, joint or muscle pains or aches, depression or anxiety and a loss of smell as well.

Because of the persistent and serious effects Long COVID has had on so many, on July 26, 2021 the federal Department of Health and Human Services and the Department of Justice declared it to be a disability under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. Ch.126, Title II (relating to state and local governments) and Title III (relating to public accommodations), Section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. §701 et seq., and section 1557 of the Patient Protection and Affordable Care Act (ACA), 119 through 124 U.S.C.

These laws protect disabled people from discrimination because of their disabilities, which now includes those suffering from Long COVID, so long as "it substantially limits one or more major life activities."

These activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, writing, communicating, interacting with others and working." The term also "includes the operation of a major bodily function of the immune system, cardiovascular system, neurological system, circulatory system or the operation of an organ."

Some of the damage caused by CO-VID-19 that leads to these limitations targets the lungs, heart or kidneys, while the disease can also result in neurological damage or damage to the circulatory system that results in poor blood flow, as well as lingering emotional illness or other mental health conditions.

Some identified examples of limited major life activities caused by Long COVID include lung damage resulting in "shortness of breath, fatigue, and related effects" that "substantially limit respiratory function," as well as gastrointestinal problems such as months-old nausea, vomiting and intestinal pain; there can also be "memory lapses" and "brain fog" causing substantial limitations in brain functioning.

Public accommodation suggestions for Long COVID sufferers include, but are not limited to "'(p)roviding additional time on a test for a student who has difficulty concentrating, modifying procedures so a customer who finds it too tiring to stand in line can announce their presence and sit down without losing their place in line, providing refueling assistance at a gas station for a customer whose joint or muscle pain prevents them from pumping their own gas, and modifying a policy to allow a person who experiences dizziness when standing to be accompanied by their service animal that is trained to stabilize them."

More importantly, both the ADA and RA apply to prisoners and given the hundreds of thousands of prisoners who have contracted COVID since the pandemic began, it will likely be affecting large numbers of prisoners.

Source: U.S. Department of Health and Human Services and U.S. Department of Justice, Guidance on "Long COVID" as a Disability Under the ADA, Section 504, and Section 1557, Bulletin of July 26, 2021

## Join us over here at Divaz and Conz.

Where real divas and cons are appreciated. This pen-pal social media site was designed for you by you. That is why for a limited time you all can join free! That is right free! We also have a new audio recording feature so you can give people a little bit more. Time is running out! Join us free now!

**divazandconz.com**

# Michigan Supreme Court Holds Convicted Prisoner Entitled to Pre-Trial Jail Time Credit

ON JULY 29, 2021, THE MICHIGAN Supreme Court ruled en banc that pretrial detainees are entitled to jail time credit if they were unable to make bond except for jail time served after a parole revocation warrant issued.

Erick R. Allen was on parole for crimes he was convicted of in 2013. He was arrested on July 12, 2015 for possession of less than 25 grams of cocaine. The Michigan Department of Corrections (MDOC) did not issue a detainer so he was released on a personal recognizance (PR) bond. He missed two court dates and was jailed on a $5,000 bond on August 17, 2017. Unable to raise bond, the court released him on August 31, 2017 so he could attend a drug rehabilitation program.

Allen brought drugs with him to the program and was arrested September 5,

2017. MDOC issued a parole revocation warrant that day. He remained in jail through trial and sentencing on March 1, 2018. Because he was on parole the entire time, the trial judge decided he was not entitled to pre-trial jail time credit. He spent 17 days in jail before MDOC issued a detainer for him and 178 days thereafter until he was sentenced.

The jail time credit issue was appealed. The appeals court denied credit based on *People v. Idziak*, 484 Mich. 549 (2009), where the state's supreme court analyzed circumstances for jail time credit granted or denied based on instances of parole detainers being issued o the court held Allen entitlement, including MDOC issued the d *Allen*, 330 Mich. App

TRULINCS 34996044 - HENDERSON, STEPHEN - Unit: CLP-K-B

--------------------------------------------------------------------------------

FROM: 34996044 HENDERSON, STEPHEN
TO:
SUBJECT: Witness List
DATE: 04/13/2023 11:06 AM

1. Leon Anthony Frederick (My Cellmate) *REGISTER # 86340-004*

2. Flagg (RN)

3. Ms. Collins (Officer)

4. Mr. Hendrix (Officer)

5. Mr. Howard (Officer)

6. Mr. Hilton (Officer)

7. Medical Records - Coleman II Health Services and US Health Medical Center

8. Coleman II Cameras J1/L1

*EXHIBIT #4*
*1-OF-1*